I'm Alan Palmer, representing Bank of America in this case. Given my time limit, I only have one fairly brief point to make. My only point has to do with the retained earnings issue. We think this issue is pretty straightforward. As to retained earnings, this case is exactly like the home savings case that was decided by this court two years ago. In both cases, retained earnings replaced some of the regulatory capital that was lost as a result of the government's breach of contract. The court below held in this case that the cost of retained earnings was limited to common dividends actually paid in a year or two between the retention of earnings and the time that thrift was sold to Bank of America. That resulted in zero damages because those dividends were outweighed by the proper offset that the court applied. And that's directly contrary to home savings. We made this point clearly, I think, in the bank's briefs. But one thing I'd like to add is a reference to this court's opinion on home savings that nails down the point that the cost of retained earnings isn't limited to dividends paid but is the thrift's cost of capital. At page 1354, this is at 399F3rd, this court's home savings decision noted that the retained earnings damages in that case were based not on dividends paid but, and here I'm quoting, on, quote, the rates the thrift's investors would expect on retained earnings. That is the thrift's cost of capital. So quite simply, home savings requires reversal of the decision below on retained earnings and a remand directing that court, the Court of Federal Claims, to base its damages analysis on the thrift's cost of capital and not on common dividends paid for the year or two before the bank was sold. At this point, unless the court has questions, I would like to reserve the remainder of my time. Thank you. Thank you, Your Honors. Good morning, and may it please the Court. I'm Michael Johnson, representing Plaintiff Cullen's Dumanian Thrall. Your Honors, the realities of the Hanfed acquisition, as reflected in the documents and uniform testimony, show that the trial court ordered in holding the Dumanian Thrall lack of privity with the government. Dumanian Thrall made a written promise directly to the government to contribute $2.5 million of their personal assets to the thrift under circumstances where the government would surely benefit. The promise was requested by the government, addressed to the government, and inured to the government's benefit. In every other decision where this court has addressed in the Windstar case investors making similar promises, they have been held to have standing as contract parties, Your Honors. Castle, SoCal, Blue Bondit. But do other cases have an instance where those parties also formed a holding group to negotiate the entire deal? Yes, Your Honor. Castle and SoCal and Blue Bondit each involved a holding company, and each involved at a level where the shareholder was at the top, the holding company was interposed between the ultimate owner and the thrift, and each of those involved promises running from the shareholder plaintiff, the investor plaintiff, to the government and the government's reciprocal promises, although performance arguably would be rendered to the thrift, ran to the investor. In each of these cases, the reality of the transaction was, as Mr. Falstich testified in this case, the government dangled the forbearances to induce the investor plaintiffs, not a holding company that hadn't even been created yet, that had no capital, that had no track record, but to induce these particular prominent, successful, high-profile investors that the government considered a coup to attract and from whom the government insisted on receiving personal promises, personal promises, personal consideration from the investors to the government. In each of those cases, the investor plaintiffs were held to have standing to pursue their claims for damages. Now, in this case, back in 2003, the trial court fashioned a special ad hoc rule that, in order for a shareholder to be considered a party to the underlying transaction, the shareholder's participation not only must be essential to the transaction, but also must be acknowledged in the form of a written promise, sought by and made directly to the government that is formally recognized to constitute part of the party's overall undertaking. Your Honors, no one can defend that standard today. It's simply wrong. I know, however, that even if it were right, we think we need it. We executed a promise directly to the government that was unquestionably part of the overall transaction. But the trial court standard is simply wrong. The trial court are applying the wrong standard. The answer to your question is no, of course not. This may be naive, but what liability do you think your clients would have had if they hadn't gone through whatever it was that they promised? That is, other than they wouldn't have had the benefit of this deal, what liability did they subject themselves to by their promise? The government could have rescinded the deal, of course, if this were considered a material breach, and I think it would have been, given the import the government placed upon getting this consideration from the investors. I think we need to recognize that two days, two days before the proposal was forwarded to the bank board for its consideration, the parties were still dickering about the contours of the investor plaintiff's promise to the government. We can see that in the letter from Mr. Thrall to Ms. Marshall of the bank board, and that appears at page 400160 in the appendix. But you're not suggesting that your clients had any risk of personal liability for it. Oh, certainly they did. That was what the guarantee put upon them, personal liability that they bore as contract parties, that had they elected to remain mere shareholders, they in no sense would have borne. Their contractual commitment to the government allowed the government to come to them and say, Mr. Dumaney, Mr. Thrall, pay up an additional $2.5 million because you promised us you would under these circumstances. They promised they would enter, they would become guarantors. That's correct, Your Honor. And at common law, a guarantee is sufficient consideration. The restatement of contracts treats it as a contingent promise, which is specifically acknowledged to be consideration for return promises. The restatement of surety and guarantee demonstrates that the most common arrangement for a guarantor is one in which he is in a contractual relationship with the obligee. In that case, the government and Dumaney and Thrall. But the Court of Federal Claims here found that all the obligations of your clients were owed to the holding company, not the unfed in the first place, unfed in the first place. Your Honor, that's error that can't be supported by the evidence. We need only look directly to the bank board's resolution, not the testimony from the chairman of the bank or the president of the Federal Home Loan Bank, each of whom testified clearly that they intended to and did make a contract with the investment. But the resolution, page 5 of Resolution 86910, which is at 8200183, there are two terms here in the report. First, the written personal guarantee, which we've already discussed. We'll come back to that in a moment. But let me also direct the Court— You're going to hear a rebuttal. Do you want to use it all now? I'll reserve one minute because I'd like to note that item 7 of the resolution specifically directs— it's addressed directly to the principals, and it mandates that they pledge their agreement to certain terms proposed by the government. Those are words of contract, Your Honor. The government directed them to Dumaney and Thrall. It sought their agreement, and Dumaney and Thrall provided it. And let me address briefly the guarantee letter. It is a financial commitment made directly from Dumaney and Thrall to the government. The government sought it. It's not addressed to the holding company, Your Honor. It's addressed to the government. Dumaney and Thrall signed it in their personal capacities. It could not be any more clear, Your Honors, that Dumaney and Thrall were making a promise directly to the government. They have standing as contract parties. This Court should reverse the trial court's holding to the contrary. Thank you. Mr. Hughes. Thank you, Your Honor. May it please the Court. As to Bank of America's appeal with respect to hypothetical costs for retained earnings, the trial court did not abuse its discretion in selecting an actual cost methodology to measure damages here. While we respectfully disagree with the rulings that home savings will solve with respect to retained earnings, we recognize these are presidential here. Regardless, neither requires that the trial court's methodology be overturned. Home savings dealt with an expectation of that dividends would be paid out in the future on retained earnings. Now, what Bank of America has pointed to is, well, there were three of those years of the 26-year period of retained earnings that had already elapsed, and they did not use an actual cost measurement for those three years. However, that was within the measure of discretion of the court. Twenty-three of those years were in the future. It had the ex-ante measures of those. As far as combining the three years that had already elapsed with that ex-ante model instead of having a separate ex-post model, that was within the discretion of the court. Bank of America also states that the trial court opinion will solve, too, as part of the damages there, were based upon dividends projected between the date of trial and 2012, the year last year Supervisor Goodwill would have been held. However, the same sentence in will solve, too, notes that the damages model there was based upon the actual dividends paid between 1992 and 2005, supplemented by projections of dividends in the future. Will solve, too, thus supports the damages methodology selected by the trial court here, and the use of actual dividends paid for past years. Here, only two-and-a-half years of retained earnings were issued, and the amount of dividends actually paid by HONFED, HFH, for the retained earnings was known. The court did not abuse its discretion. With respect to the appeal of the shareholder plaintiffs, the trial court was not clearly erroneous in finding that DuMonte and Thrall failed to demonstrate appropriate contract with the government, as the bank board resolution the trial court found to constitute the contract addressed only promises between HFH and the government. DuMonte and Thrall cite Levin, primarily cite Levin, Homesavings, and Caroline Hunt, but all are distinguishable on their facts. Moreover, these are the same, identical shareholders whose claim of privity this court rejected in SoCal, and the same claim should be rejected here. Also, the concerns raised by this court in SoCal as to a double recovery by the shareholders and the corporation apply equally here. The HONFED and HFH shareholders were paid by Bank of America with the full value of their investment, except to the extent those payments were made to the Bishop Estate instead. And those payments to the Bishop Estate were the damages that Bank of America saw. Thus, any dilution damage to the shareholders, by necessity, would be the same damages that Bank of America saw here. It would represent an impermissible double recovery. Now, with respect to Levin, as noted, that relates heavily to the fact that the bank board resolutions, name the acquirers, expressly approve the transaction condition on their ownership of the thrift. Homesavings, the resolutions, in that case, referred to Amundsen as the acquiring entity. Caroline Hunt, Trust Estate, this court noted that federal and bank board resolutions identified both Caroline Hunt and thrifty stock its own that applied for the approval as the outcomes. And this court also noted that the bank board's resolutions granted the regulators the authority to decide which applicant, Caroline Hunt, or the thrift, would sign necessary documentations. Here, the documents evidence that HFH was the applicant, that his application to acquire HONFED was approved, and that all the obligations of the agreement were those of HONFED, or of HFH. Now, with respect to statute of limitations, as to statute of limitations, the trial court's legal conclusion in denying our motion to dismiss was an error. During the month of September 1989, HONFED changed its plans from acquiring the first nationwide bank branches before raising capital, to acquiring those branches after raising capital, or at the same time as raising capital, due to the government's breach. And BOA is now appealing a $2 million deposit  an extension required by the government's breach. If the deposit was caused by the breach, then the breach was complete by September 14, when HONFED had informed regulators it was going to delay the branch transaction. Now, Bank of America asserted below that HONFED and HFH's contract gave them permission to operate HONFED with no tangible network. The record is clear that contrary to this contract, that BOA asserts, the government began regulating HONFED on the basis... Is it the government's preferred position or position in this case that the act itself was the breach, as has been held in three prior circuits? Yes, Your Honor. That is still our position that the breach was the breach. However, we recognize that this circuit has held in the past that, or is not designated in the past, which of the three events they pointed to in Ariadne and Shane... The question is open, isn't it? What's that, Your Honor? The issue is open here. The issue is open here, Your Honor. And what we point to is not one of those three events. What we point to is the language in the trial court in Shane and Ariadne that, in effect, the breach occurred when the government started regulating on the basis other than recognizing goodwill. And what we point to here is that in August and September of 1989, HONFED significantly exceeded then-current capital regulations. There were tens of millions beyond the minimum, including the goodwill. The regulations that were in place at that point. Now, contrary to that, the Office of Credit Supervision used the new three tangible capital standards, one, to examine HONFED's application to acquire First Nationwide Bank's branches, two, to block the automatic approval of that transaction months before capital regulations changed. And three, to require HONFED to commit itself immediately to raising capital to meet FREIA's tangible capital requirements months before the issuance of new capital regulations. Now, we also noted in our brief that HONFED and HFH immediately recognized this new state of affairs at Harman. On August 31st, they notified the government that the FND application needed to be resolved within the week or they would have to pull the plug on the transaction. The same day, they said their plan was to close on the FNB transaction by September 22nd and then to move on to raising capital. Now, their plan of closing by September 22nd is well within their parameter of closing the transaction by December 31st. Once they had changed that plan, as a result of Governor Scrooge, they obviously had to change the date if they wanted to continue with this transaction. Is your position that the earlier change in one of the cases that Governor Scrooge cited based on the facts that were presented there precludes this court from going into other circuits on whether they hacked itself or SD? No, Your Honor. It's a similar question as you noted earlier. Well, I know, but you're not hitting it very hard. Why is that? No reason, Your Honor. Your Honor, we did not address that in our brief. We just noted that our argument was still that the preamble was breached. With respect to the case law in the area of McShane that said the breach was...   It's not true. It's not true. ...when it refused to allow use of the goodwills that it promised and also that the breach of contract claim accrued in the area and he should have known that it had been harmed. That's the language we focus on, since that's the existing precedent of this court. And what we pointed to is, clearly, in September of 1989, well before September 29th of 1989, which was six years before they filed their complaint, HONFED and HFH knew not only that they were being regulated based on their tangible capital and no longer had this contract that they asserted in the trial court of not being required to operate HONFED with tangible capital, but they also knew that because they had to change their plans, they had been harmed. Now, they could have dropped that transaction at that point. We do not agree that the deposit is at the insurer. However, they clearly recognized at that point that they had been injured. Now, with respect to the tax gross-up issue, with respect to Bank of America's request for a tax gross-up, the trial court was not clearly erroneous in finding that Bank of America failed to demonstrate its taxability to the awardeer. HONFED statements in all three merely indicate that the trial courts in both cases were not clearly erroneous in awarding a tax gross-up and Bank of America failed to demonstrate a taxability award here. In fact, the trial court in Home Savings said, quote, there is nothing to suggest that plaintiffs are not correct, that the award would be taxable, and Home Savings found that to not be clearly erroneous. The trial court in LaSalle, after discussion of case law, said it thought there was a possibility the award would not be taxed, but it didn't think it was a high possibility, so the award would be gross-up. In LaSalle 3, this court concluded that it was not clearly erroneous that the damages award would most likely be subject to income taxation. In fact, the trial court here listed all the evidence and concluded, citing other trial court decisions, that both made a far less convincing case that the proposition that any such recovery would be taxed at all. We are thus unwilling to enter into work for damages that may never in fact come due. The government presented expert testimony that the damages being sought would not be taxable, and Bank of America's experts said they were merely assuming that an award would be taxable. Now, Bank of America's reply brief does assert, at page 51, that the record below included extensive testimony to the effect that any award would be taxable. However, the only record citation that Bank of America was able to supply at that point was Bank of America's own statement to the IRS that Bank of America believed that an award would be taxable in full. And that's at A200665. However, Bank of America's statement that it thinks that an award will be taxable does not bind the IRS in interpreting the tax laws in a uniform manner and did not bind the trial court to evaluating the evidence. The trial court's conclusion that Bank of America did not prove that an award would be taxable is not clearly erroneous. Now, with respect to the liquidated dividend, the trial court clearly erred in awarding the so-called liquidated dividend as damages where that dividend would have been paid in absence of the breach. The undisputed evidence was that Bank of America did not want to acquire these properties, so the properties had to go to the shareholders in either a breach or a no-breach scenario. Bank of America has asserted that not including this liquidated dividend as damages is inconsistent with LaSalle 3. However, this court in LaSalle 3 approved the trial court's method of making a distinction for damages purposes between dividends that would have been paid anyway in a no-breach scenario and those that would not be. At A1335, quote, the court's modified damage model further reduced the cost of replacement capital award by the amount of dividends that Talman would have distributed to stockholders had there been no breach. And at A1336, the claim court did take into account but for dividends. Here we have a liquidated dividend that would have been paid either way to the shareholders because Bank of America didn't want those properties. This court's opinion in LaSalle 3 thus supports excluding the liquidated dividend from damages. As the Bank of America's claim for the lost $2 million deposit, Bank of America asserts that it is just attacking the trial court's legal conclusion that the trial court rejected this element of damages because it was unforeseeable and because causation was not demonstrated. So Bank of America must demonstrate that these findings were clearly erroneous. Bank of America has not been able to do so since the end of my rebuttal time. Your Honor. Thank you. Mr. Powell. Yes, thank you, Your Honor. With respect to retained earnings, very briefly, the government has essentially won an argument, as I heard Mr. Hughes, which is that what the lower court did was within its discretion. We would submit that inasmuch as there is no factual difference in respect to retained earnings between this case and home savings, no factual difference, Mr. Hughes has a point of tension that it is indeed an abuse of discretion or legal error for the court below to have come out differently from home savings. We ask, in other words, simply that the home savings government retain earnings issue. We think that that is all we need and that that would produce the result that we see. On statute of limitations, Mr. Hughes somehow suggests that there was damage done like that, and indeed there had to be damage in order for the claim to approve and the clock to begin ticking. Ariadne says that a plaintiff must know that it has been damaged by a breach of contract in order for the claim to approve and the statute of limitations to begin to run. What's the damage? What is the damage that occurred before October 6th? We know that if no damage occurred before October 6th, then the court below was correct. We didn't even know there was a breach. I'm sorry? We didn't even know there was a breach. You need to know there was a breach. The damages may not have been approved yet. Indeed, you need both. The statute of limitations would then be damages, and all of these would probably figure out what they might be. Agreed. So you have to know what the damages are. Do you know yet? It has to be a breach. It has to know what damages are. Hopefully we know what damages were as a result of the trial. That's part of what we're arguing about. But certainly before October 6th, there was no breach and no knowledge of damage. What is the breach? The breach, I'm not sure what it is. There was a postponement of a decision under a regulation that specifically said we can postpone our decision for 30 days. The government apparently suggests, though I don't know how they took this seriously, that as soon as that occurred, HONFEC should have come into court and said to the Court of Federal Claims, there has been a breach and we're damaged. They have to show both. If HONFEC would have come into court before October 6th, 1989 and made such an argument, it would have not passed the straight face test. Three months later, in the flagship case which we cited, three months later, after the regulations dealing with the new capital standards had been in effect in December, after a bunch of other things had occurred, HONFEC came to court and said we've been damaged and we want an injunction against illegal conduct. And the court said, not right, not right. If HONFEC had come in before October 6th, the very same thing would have occurred. The government would have defended as it did in flagship by saying, what's the damage? We haven't said you can't make this acquisition. And if the damage is that there's been a postponement, well, that's not damage at all. So we would have lost. That issue had HONFEC come into court before October 6th. On statute of limitations, you said HONFEC would not have been able to use the Google We certainly did not know that until December 7th because under the regime that governed under FIREA, HONFEC, like Waltrax, had until December 7th to count all of its regulatory capital. And it did.  to require that additional capital be obtained prior to approval of the acquisition. Even that wasn't damaged. The testimony of Mr. Hughes referred to the effect that September 22nd was targeted for the acquisition comes from a document in which the author, the president of HONFEC, said, with a whole lot of luck, quote, unquote, we hope to do the acquisition by September 22nd. I don't think that quite gets the government where it wants to go, particularly in light of contrary testimony which we cite in our brief by the CEO of HONFEC that even in the best of worlds, the acquisition would not have occurred until the last day of the quarter, September 30th. Now, I may have misunderstood the questions from Your Honor to Mr. Hughes about statute of limitations. But certainly there is no circuit that has held that the statute began to run with the enactment of FIREA. If I misunderstood the question, I apologize. That's what a lot of other circuits have said. They said in the context, and the lower court here made this point pretty well, there have been statements and opinions in contexts which did not involve the statute of limitations. Statements in the course of an opinion dealing with other issues that the law changed when the statute was enacted. But that is not in the context of a case which is examining when a claim accrued for statute of limitations purposes. I think it's important to bear that in mind. The portion of the court's decision below that addressed that did a pretty good job. Liquidated dividend. The government has the burden of showing that that decision by the court below was a clear error. I don't think it's done so. It was a dividend. All capital has a cost. This was a cost. Thank you, Your Honor. You have a couple of minutes. Your time is up as well. You divided up your time very strangely to get a 1-7-5-2. That's kind of wasteful, but we'll give you a couple of minutes. You used your time. Thank you, Your Honor. I'm enormously grateful, and I'll be brief. Levan establishes that the ordinary standard, intent, consideration, authority, governs privilege here. Carolyn Hunt establishes that that standard applies to shareholders without regard to the corporate relationship between them and any corporate entity, without regard to any contractual relationship between the government and their corporation. Your Honor, the government cites SoCal. In SoCal, this court held that Dumanian Thrall can't stand it. They can't stand it to pursue their claims against the government because they signed a capital guarantee, just like they did here. Now, that case is different because it involved two integrated agreements, and the terms of those agreements, one of which, Dumanian Thrall were a party to, the other of which they weren't, certainly bore on the causation and foreseeability issues that governed the damages decision there. But damages aren't before this court. Dumanian Thrall haven't put on a damages case yet, and this court held unequivocally in Levan that it is error, it is error to conflate damages issues with standing issues. So, Your Honors, the trial court heard in holding that Dumanian Thrall backed privity with the government. This court should reverse that holding, remand the case for the determination of the damages the government owes Dumanian Thrall. Thank you very much. Thank you, Your Honor. Your Honor, with respect to the sexual limitations, we would note that, with respect to the injury that's required for the sexual limitations to approve, you just need to know that an injury occurred, you don't have to have measured that or have an exact amount at that point. With respect to the approval of this cause of action, in fact, on August 31st, we have the new factual scenarios being applied about new capital requirements that did not exist at the time of the contract. They're complaining that they're going to have to pull the plug if this thing is not approved within roughly a week. Which date, sir? That's August 31st, Your Honor. Did you have a response from the 28th? It was a meeting held subsequent to August 28th. August 28th proposed some conditions, and there was a teleconference on August 31st. Now, also on August 31st, the government sent out a letter after they had this teleconference for the same time, in which it had been described that they were... in which it was described that basically they needed to accomplish this by September 22nd. The government came back and said, you know, there was... it would have been automatically approved on September 5th, but we're going to extend it. And the only reason given for that extension was because they failed to meet Brea's tangible capital standard. So our point is, Your Honor, is that the breach was effective either on August 31st or September 5th. Now... with respect to... let's see if my time is up. Based on the previous... We gave them a number of minutes. ... Your Honor, can I address shareholders briefly? With respect to Bank of America's statement that what was the breach here. The breach was that unfed, or Bank of America represented, that they had a contract where they did not have to have to operate this drug. It was clear from the events of late August, September 1989 that that contract was no longer in place. In fact, by September 14th, we have evidence that HUNFED, HFH had already informed OTS they'd changed their plan. And the memo there by the regulators indicates that they are applying this rule across the board that tangible capital free, it must be met at this point. And they're judging applications on the basis that by September 22nd, we've got an informal agreement, okay, we're going to raise roughly $100 million before we acquire these branches. It's already in place. The formal letter hasn't gone out, but the point that we're making, Your Honor, is the breach was regulated on the basis of the tangible capital standard which started occurring on August 28th, and clearly it caused a breach no later than September 27th. Now with respect to our claims in general, based on the previous briefing in this field and our arguments today, we respectfully request that our appeal be granted, and our motion to strike non-recorded materials from the appendix in reference to those materials be granted. Thank you. Your Honor, may I have 30 seconds to cite two pages of the appendix only that have not been cited in the briefs? Recite them. I just want to refer the court to what they are. You know, on the statute of limitations issue, the proposed conditions of August 28th... Well, we're not going to have an American... Okay. Page 4-0-0-4-8-0 of the appendix shows that those conditions did not require HMFA to comply with new capital regulations, and page 2-0-0-3-0-7-0-8 shows that the condition on the acquisition was based on safety and soundness rather than on the new capital regulations. All right. Thank you. Thank you.